UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LONDON DE'SHAWN NEAL,

        Plaintiff,

v.                                          Case No. 24-CV-182

LT. MARCUS KING,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff London De'shawn Neal, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Neal was allowed to proceed against defendant Lt. Marcus King pursuant to the Eighth Amendment because King was allegedly deliberately indifferent to Neal's suicide attempt. Neal was also allowed to proceed on a retaliation claim against King pursuant to the First Amendment. King filed a motion for summary judgment which is fully briefed and ready for a decision. (ECF No. 47.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 3, 12.)

### PRELIMINARY MATTER

Neal concedes that King is entitled to summary judgment on the First Amendment retaliation claim. (ECF No. 61 at 2.) As such, summary judgment is granted in favor of King on that claim. The remainder of the order will focus solely on facts relevant to the Eighth Amendment deliberate indifference claim.

# FACTS

At all relevant times Neal was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 49, ¶ 1) King was employed at GBCI as a Supervising Officer 1 (Lieutenant). (*Id.*, ¶ 2.)

On September 6, 2023, King was working the second shift (2:00 p.m.-10:00 p.m.) in the Restrictive Housing Unit (RHU). (ECF No. 49, ¶ 8.) Neal was housed in cell 214 in the RHU. (*Id.*, ¶ 11.) That day, King learned "that a new process had been put in place in RHU. Inmates would now be required to have their light on and show their hands before their food port could be opened." (*Id.*, ¶ 12.) This process was mandatory. (*Id.*, ¶ 13.)

At approximately 4:50 p.m., non-defendant Officer Hanson informed King that Neal had covered his cell window and would not display his hands in order to get his food tray. (ECF No. 49, ¶ 16.) King went to Neal's cell to figure out what was going on. (*Id.*, ¶ 17.) His interaction with Neal was caught, with audio, on his body camera. (ECF No. 50-1.) King explained the new policy requiring prisoners to show their hands any time the cell's trap door is open, including at meal times. (*Id.* at 0:00-0:30.) Neal was argumentative, saying that he should have been notified of the policy via a memo, and King explained that not all policy changes are immediately introduced by a memo. (*Id.* at 0:30-1:24.) King asked Neal to show his hands and told him that, if he did so, he would give him his meal tray. (*Id.* at 1:24-1:34.) Instead of showing his hands, Neal continued to argue about whether he should have received a memo, and this argument went on for several seconds. (*Id.*, at 1:34-2:23.)

King determined that Neal was not going to comply and show his hands, which King interpreted as Neal refusing his meal tray. (ECF No. 49, ¶ 25.) Neal then asked King if he was going to give Neal his meal tray, to which King responded that Neal would not be getting a meal tray because he was given an opportunity to receive one but he refused it. (ECF No. 50-1 at 2:25-2:33.)

King then briefly went to check on another prisoner a couple of cells down the hall from Neal's cell. (ECF No. 50-1 at 2:33-2:49.) Neal called King back to his cell and held up two small plastic bags with what appeared to be pills. (*Id.* at 2:49-2:55.) When Neal told King he was going to take all of the pills, King responded that he would have to go "get a team", meaning an extraction team. (*Id.* at 2:50-3:08; ECF No. 49, ¶¶ 31-32.) The video ends with King walking away from Neal's cell, but a voice can be heard telling King that he knows he should not be walking away because Neal threatened to take the pills. (ECF No. 50-1 at 3:08-3:23.)

King states he left Neal's cell to contact ADO Schultz "to obtain permission for use of force if staff needed to remove Mr. Neal from his cell for his own safety." (ECF No. 49, ¶ 32.) King asserts that, at that time, he did not believe Neal was suicidal. (*Id.*, ¶ 35.) Instead, he believed Neal was threatening to harm himself because he was upset about the new policy and not having received his meal tray. (*Id.*, ¶ 37.)

ADO Schultz gave King approval to use force if necessary, and approximately two minutes after King left Neal's cell door he returned. (ECF No. 49, ¶ 39.) At that point, King states he did not return with a cell extraction team because he "wanted to give Mr. Neal another chance to be compliant before using force." (*Id.*, ¶ 40.) King's interaction

3

with Neal was caught, with audio, on his body camera video. (ECF No. 50-2.) Neal's cell window was covered when King approached the cell. (*Id.* at 0:10-0:38.) King knocked on the cell door, and when Neal did not respond, King told Neal that, if he did not respond, he "would have to put together a suit up team." (*Id.*) Neal then appeared at his cell window holding a cup and told King he was suicidal. (*Id.* at 0:38-0:43.) He also showed King a handful of pills and told King he was going to take them. (*Id.* at 0:43-0:49.) Neal then brought his hand to his mouth and swallowed the handful of pills. (*Id.* 0:49-0:58.)

King asserts that, within the seven seconds between Neal showing him the handful of pills and Neal actually taking the pills, he was unable to prevent Neal from taking the pills. (ECF No. 49, ¶ 48.) King did not carry a set of keys to either the cell or the food port on the cell door, so he could not have used pepper spray to prevent Neal from swallowing the pills. (*Id.*) Staff are also not permitted to open a cell door alone "because this puts the staff at risk of being assaulted by the inmate." (*Id.*, ¶ 49.)

As soon as he saw Neal take the pills, King states he immediately went to the security office to notify the Health Services Unit (HSU) and the Psychological Services Unit (PSU). (ECF No. 49, ¶¶ 51-52.) He also was required to notify other supervisors on shift in case he needed to pull staff from their areas if Neal needed to go to the hospital. (*Id.*, ¶ 52.) Additionally, King needed to put together a cell extraction team to remove Neal for medical treatment. (*Id.*, ¶ 53.)

As King was making these arrangements, he asked non-defendant Officer Bridges to go to Neal's cell door and watch over him. (ECF No. 49, ¶ 54.) According to surveillance video, Bridges arrives at Neal's cell door a little over two minutes after King

4

left the cell door. (ECF No. 51-1 at 7:53-10:26.) While King was making all the necessary arrangements to get Neal help, staff informed King that Neal was willing to voluntarily come out of his cell. (ECF No. 49, ¶ 58.) Unidentified non-defendant officers then removed Neal from his cell and escorted him to the HSU without incident. (*Id.*, ¶ 59.)

Neal was examined by non-defendant Nurse Joseph Kawalski, and Neal told him he took 20-30 pills that he believed to be mirtazapine and diphenhydramine. (ECF No. 49, ¶ 60.) Neal "became increasingly lethargic, vomited a small amount, and was sweating." (*Id.*) The on-call doctor sent Neal to the emergency room via ambulance. (*Id.*, ¶ 63.) Neal did not cooperate at the hospital, refusing to speak to hospital staff, so he was admitted overnight for monitoring and treatment. (*Id.*, ¶ 64.)

When Neal returned from the hospital the next day, September 7, 2023, he was placed on clinical observation status so he could be monitored. (ECF No. 49, ¶ 68.) On September 8, 2023, Neal met with non-defendant PSU clinician Amy Woolf, telling her that he got the pills at recreation time and didn't know for sure what they were, "but he just decided to take them." (*Id.*, ¶ 69.) On September 11, 2023, Neal told PSU staff that "he had been very stressed and then made angry by [corrections] staff and had taken the pills." (*Id.*, ¶ 70.) On September 12, 2023, Neal told PSU staff he did not remember why he took the pills and that he was "just having a moment." (*Id.*, ¶ 71.)

Neal does not dispute the majority of the facts. Instead, he asserts that King should not have walked away from his cell the first time. (ECF No. 61 at 4.) In doing so, Neal states he was able "to swallow a cocktail of pills in [King's] absence." (*Id.*) Neal also highlights that both body camera videos show him telling King he was suicidal. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Neal claims that King violated his constitutional rights when he failed to prevent Neal from swallowing several pills. The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "A § 1983 claim based upon a violation of the Eighth Amendment has both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). In instances of self-harm or suicide, a plaintiff must "allege plausibly that prison staff (1) knew of a significant likelihood that he would imminently attempt suicide and (2) failed to take reasonable steps to prevent his attempt." *Davis-Clair v. Turck*, 714 Fed App'x 605, 606 (7th Cir. 2018)

Neal argues that King was deliberately indifferent because he failed to take reasonable steps to prevent him from swallowing the pills. Specifically, King was deliberately indifferent when he said he was going to get an extraction team and then walked away from his cell, leaving Neal alone to swallow the pills. "Deliberate indifference requires a showing of 'more than mere or gross negligence, but less than the purposeful or knowing infliction of harm.'" *Collins*, 462 F.3d at 762 (quoting *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)). "We have characterized

7

the required showing as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Id.* (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)).

No reasonable factfinder could conclude that King showed "total unconcern" or more than gross negligence in addressing Neal's situation. It is undisputed that, when Neal first showed King the pills and threatened to swallow them, King immediately began the process to extract Neal from his cell in an effort to prevent Neal from swallowing the pills. This included getting permission to use force if necessary. Knowing that force may be used, King then went to give Neal another chance to comply with his orders. When Neal refused and then swallowed the pills in front of King, King snapped into action, contacting the HSU, PSU, and other supervisors for assistance. He had another officer go and wait by Neal's door in the meantime. He also began putting together an extraction team. While King was making these arrangements, which took only a few minutes, Neal voluntarily agreed to be removed from his cell. Neal then immediately got treatment and ultimately ended up at the hospital.

Neal appears to argue that King should have prevented him from actually swallowing the pills. But, given the security issues, Neal's hostility and uncooperativeness, and the fact that King was alone and did not have keys, such immediate measures were unavailable. Just because King did not prevent the harm does not mean he is liable. *See Davis-Clair*, 714 Fed. App'x at 607 ("An official who responds reasonably to a risk of harm is not deliberately indifferent to it even if the

8

official fails to avert the harm.") Because no reasonable factfinder could conclude that King acted unreasonably, summary judgment is granted in his favor.

## CONCLUSION

For the foregoing reasons, King's motion for summary judgment is granted. King also argued that he was entitled to qualified immunity. Because the court found in his favor on the merits, it does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that King's motion for summary judgment (ECF No. 47) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot

9

extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 13th day of February, 2026.

BY THE COURT

*William E. Duffin*
WILLIAM E. DUFFIN
United States Magistrate Judge